6:19CV-389
JCB

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

*FILED*

AUG 2 8 2019

Clerk, U.S. District Court
Texas Eastern

| | | |
|---|---|---|
| Leonid Goldstein | | Jury trial is demanded |
| | | |
| *Plaintiff* | | |
| | | |
| v. | | |
| | | |
| Facebook Inc. | | |
| | | |
| *Defendant* | | |

1

# Plaintiff's Original Complaint

## Table of Contents

Nature of Action ................................................................................................. 3

Parties ................................................................................................................ 3

Jurisdiction and Venue ...................................................................................... 4

Facts .................................................................................................................. 5

    **Registry of the Political Speech** .......................................................... 5

    **Correspondence with Facebook about TPMH** .................................. 9

    **Facebook disabled Plaintiff's account on 2018 Election Day** ........ 11

    **The Broad Picture** ............................................................................. 14

Causes for Action ............................................................................................ 18

    **COUNT I. LIABILITY FOR AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)** . 18

    **COUNT II. COPYRIGHT INFRINGEMENT PURSUANT TO 17 U.S. Code § 501, FOR VIOLATION OF § 106, 504, and 505.** .............................. 19

    **COUNT III. CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS IN VIOLATION OF 42 U.S.C § 1985 (3)** ........................................................... 21

REQUEST FOR RELIEF .................................................................................. 22

DEMAND FOR TRIAL BY JURY ................................................................... 23

Appendix A is attached

Plaintiff alleges the following against the Defendant Facebook:

## Nature of Action

1.    This is a civil action brought against Facebook Inc. under the Antiterrorism Act, 18 U.S.C. § 2333 for aiding and abetting acts of international terrorism, for copyright infringement under 17 U.S. Code § 106 and 501, for conspiracy to interfere with civil rights under 42 U.S.C § 1985, and related laws.

## Parties

1.    Plaintiff Leonid Goldstein is a US citizen and a resident of Texas. Plaintiff is a technology entrepreneur, author, and scientist. Plaintiff is the president and a researcher in a small charity named Science for Humans and Freedom Institute (SHF$_i$). This charity has been founded to engage mostly in scientific and educational activities and is located at Mr. Goldstein's residence address in Austin, TX. Plaintiff lived at that same address from 2014 until recently.

2.    Plaintiff has M.Sc. in Mathematics and 20+ years of research and development experience in the tech industry, which includes computer software, cyber-security, and the Internet.

3.    Defendant Facebook, Inc. ("Facebook") is a publicly traded U.S company incorporated in Delaware, with its principal place of business at 1 Hacker Way, Menlo Park, California 94025.

4.    Facebook's main business is owning and operating the eponymous telecommunications and social media platform. Facebook also owns and operates Instagram. Facebook is publicly traded under the ticker FB, and its market

3

capitalization is in excess of $500 Billion, as of August 25, 2019. Its 2018 revenues were more than $55 Billion.

5.     After Defendant Facebook made it clear to the Plaintiff that it would continue to provide his personally identifiable information ("PII") in a context expected to incite violence against Plaintiff, Plaintiff relocated to Smyth County of Texas, which became his new permanent residence. Plaintiff prefers not to disclose the exact address.

**Jurisdiction and Venue**

6.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332.

7.     This Court has personal jurisdiction over Defendant Facebook because Facebook resides in the United States, regularly transacts business within Texas, derives substantial revenue from activities in Texas, and is engaged in criminal misconduct subject to federal laws in Texas.

8.     Venue for this action is proper in pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred and continue to occur in the Eastern District of Texas and Defendant Facebook is subject to personal jurisdiction in this judicial district. Facebook injured and continues to injure Plaintiff in the Eastern District of Texas.

9.     Jurisdiction and venue are proper under 18 U.S. Code § 2333(a).

10.    The amount in controversy exceeds $75,000. Jurisdiction and venue are proper under 28 U.S. Code § 1332(a).

## Facts

11.     Hezbollah, Hamas, ISIS (Daesh) are designated foreign terrorist organizations. Hamas is an ally of Hezbollah. ISIS is a rival of Hezbollah, and therefore is likely to search for Facebook posts mentioning Hezbollah, and to attack Americans who are found speaking about it.

12.     In 2017-2018, Plaintiff used to publish his research and political commentary as posts on Facebook, using its sponsored posts feature to reach desirable audiences. One of those posts contained a link to and a quote from a Politico article, asserting that Obama administration had shut down FBI investigation into drug trafficking by Hezbollah. This post will henceforth be referred to as "TPMH" for *The Post Mentioning Hezbollah*.

### Registry of the Political Speech

13.     In May 2018, Facebook created a Registry of the Political Speech ("the Registry"), delivered by third parties through sponsored Facebook posts. The Registry is searchable and accessible from anywhere in the world. Facebook uses the words "sponsored posts" and "ads" as synonyms. Facebook calls this Registry a Political Ads Library. Its web address is https://www.facebook.com/ads/library.

14.     In May 2018, Defendant Facebook acted as a telecommunications operator and common carrier, as defined in Title 47, Chapter I, for the promoted posts like TPMH. On May 23 and/or 24, Plaintiff submitted TPMH to Facebook for delivery to a specified group of recipients.

15.     In June 2018, Facebook posted TPMH in this Registry, together with Plaintiff's personally identifiable information (PII), as described below.

16.    TPMH became the only result returned for a search for *Hezbollah drug trafficking*. (Appendix A, Screens 1-2). It reads:

> *Science for Humans and Freedom Institute*
>
> *Sponsored*
>
> *"Obama's choice of ... John Kerry as secretary of state was widely viewed as a sign of a redoubled effort to engage with Iran. Obama's appointment of Brennan — the public supporter of cultivating Hezbollah moderates — as CIA director ... [protected] Hezbollah's billion-dollar enterprise"*
>
> *https://www.politico.com/interactives/2017/obama-hezbollah-drug-trafficking-investigation/*
>
> *<picture>*
>
> *The secret backstory of how Obama let Hezbollah off the hook*
>
> *POLITICO Investigation: An ambitious U.S. task force targeting Hezbollah's billion-dollar criminal enterprise ran headlong into the White House's desire for a nuclear deal with Iran*

17.    The copy of TPMH in the Registry is also accompanied by an additional label: Science for Humans and Freedom Institute (Appendix A, Screen 6).  This tiny charity was located at the Plaintiff's address: 12501 Tech Ridge Blvd., Apt. 1535, Austin, TX 78753. Anybody can find out that Plaintiff is the individual who operates the Institute and places its posts, and to find Plaintiff's full name, home address, and phone number. That requires only two clicks: a Google search on the name '*Science for Humans and Freedom Institute*' and clicking on the link, containing that information (Appendix A, Screens 7-8). Thus, the information placed by Facebook into the Registry is personally identifiable information (PII).

18.     Moreover, the Facebook Registry search auto-completes *'hez'* to *'hezbollah'* (Appendix A, Screen 3). The result was confirmed using a browser not storing cookies, searches, cache, or forms.

19.     The search for *'hezbollah'*, suggested by the Facebook Registry, returns TPMH next to an ad by AIPAC (Appendix A, Screen 4). In the summer 2018, Facebook Registry was showing TPMH completely surrounded by AIPAC ads, insinuating a direct connection between Plaintiff and AIPAC. AIPAC is an American-Israel Political Action Committee, an organization which is expected to be especially hated by Hezbollah, Hamas, their allies and sympathizers.

20.     There is no word *'hezbollah'* in the English language. Facebook created auto-completion of *'hez'* to *'hezbollah'* with a specific intent to aid Hezbollah, because of its direct dealing with Hezbollah, and/or based on the content of the posts it selected for the Registry.

21.     At some point, Facebook added financial information, associated with Plaintiff's page for Science for Humans and Freedom Institute. It informs readers that Plaintiff spent $41,344 on promoted posts (Appendix A, Screen 5). The link to this monetary information is placed in a way that suggests this amount of money is spent on ads similar to TPMH, although TPMH was a one-of-a-kind. Plaintiff and Science for Humans and Freedom Institute spend most of their time and money on scientific and technological topics of high public interest, such as climate and climate alarmism debates, cyber-security, and certain social effects of the internet.

22.     These Facebook actions expose Plaintiff to possible retaliation by members, supporters, and sympathizers of Hezbollah, Hamas, ISIS, and other foreign terrorist organizations, some of whom live, travel, or cross the border into the US. Facebook's actions also incite people to physically attack Plaintiff.

23.     Publishing Plaintiff's private and personally identifiable information in the Registry, also puts Plaintiff in increased danger of retaliation by domestic actors for his political advocacy. Publishing Plaintiff's personal information in such context provides any potential attackers not connected to the foreign terrorist organizations mentioned above plausible deniability.

24.     Publishing that Plaintiff spent more than $40k on Facebook next to his address additionally subjects plaintiff to the dangers of break-in, robbery, and robbery-homicide.

25.     In 2019, Facebook launched an Application Programming Interface (API)[1], allowing unlimited third parties to create applications to obtain "political ads", including TPMH, from its Registry and to display them to foreign governments, terrorist and criminal organizations anywhere in the world in any content.

26.     Facebook includes promoted posts in its Registry arbitrarily, capriciously, and discriminatory. In November 2018, it announced[2] it would exclude promoted posts by "qualifying news publishers".

27.     This act shows that Facebook was aware of the stifling effect that its Registry has on political speech and took steps to shield its partners and/or allies but continued exposing Plaintiff.

28.     Informed, protected, and emboldened by the Facebook Registry, foreign terrorist organizations committed multiple acts of terror, including:

---

[1] https://developers.facebook.com/docs/marketing-api/reference/ads_archive/, https://www.facebook.com/ads/library/api

[2] https://newsroom.fb.com/news/2019/03/a-better-way-to-learn-about-ads/

a.     On Easter Day April 21, 2019, ISIS linked terrorists murdered more than 250 people in Sri Lanka[3];

b.     On January 15, 2019, foreign terrorist organization Al-Shabab, affiliated with al-Qaeda and ISIS, murdered at least 15 persons, including at least one American, in Nairobi, Kenya[4].

## Correspondence with Facebook about TPMH

29.     Plaintiff sent Facebook two letters regarding this issue and its consequences for Plaintiff.  The first letter was sent by the Plaintiff's attorney and the second one was sent by Plaintiff himself. Plaintiff received one response letter from Facebook's lawyers White & Case LLP, located in Los Angeles, CA. In its response letter, Facebook refused to address the issue or even to negotiate. It also confirmed that Facebook's actions were intentional and in accordance with its policies, not a result of a mistake. Facebook dismissed Plaintiff's concerns about his physical safety and ability to make a living by saying that these concerns "*do not warrant a response.*"

30.     The Facebook letter also referred to "Facebook policies" dated by May 25, 2018, although TPMH has been submitted before these "policies" were emplaced.

31.     Of notice, Facebook updated its "policies" retroactively[5] to justify inclusion of TPMH and some other promoted posts, posted before May 25, as follows:

---

[3] https://www.npr.org/2019/04/23/716266428/sri-lankan-official-says-bombings-are-retaliation-for-new-zealand-massacre

[4]   https://www.foxnews.com/world/american-among-at-least-15-dead-in-kenya-hotel-attack

[5] The announcement page archived on June 5, 2018
(https://web.archive.org/web/20180605160311/https://newsroom.fb.com/news/2018/05/ads-with-political-

*"Enforcement of these new features and the Political Ads policy begins today, May 24. (Updated on June 4, 2018 to clarify start of enforcement.)"*

32.    Plaintiff filed a complaint with the police in Austin, TX on July 28, 2019. The police approved the report and assigned it number 2019-8002756, but did nothing else, to the best knowledge of Plaintiff.

33.    Creation of the Registry and placement of promoted posts like TPMH into it are intended to stymie speech of American citizens. Especially targeted are those who defend American sovereignty against the threat of "global governance", and prefer economic independence and strong actions against terrorism and violent crime. Facebook's actions are specially directed against supporters of Donald Trump.

34.    Foreign terrorist organizations, their allies and rivals, and their members, operatives, and sympathizers, are interested in finding out and/or intimidating those who criticize American politicians perceived as friendly to them. Facebook is glad to oblige.

35.    By creating the Registry of Political Speech and operating it in the way it has been, Facebook intended to suppress speech of most of the US, including but not limited to supporters of Donald Trump and the Republican party. Facebook intentionally enlisted foreign actors, including foreign terrorist organizations, to achieve this end.

36.    By these actions, Facebook intentionally aided and abetted foreign terrorist organizations.

---

content/) vs the same page archived on May 25, 2018
(https://web.archive.org/web/20180525033236/https://newsroom.fb.com/news/2018/05/ads-with-political-content/)

37.    Facebook freely admits that it created the Registry to allow everybody, everywhere on the globe to retaliate against Americans whose speech they don't like. Facebook calls that exposure "being held accountable". Examples in Facebook's own words (emphasis is added):

> *"By shining a light on political ads, news organizations, regulators,* ***watchdog groups and people anywhere in the world can hold advertisers*** *and us more* ***accountable.***" [6]
>
> *"We also believe that* ***advertisers*** *and us* ***should be held responsible and accountable for the content and ads.***"
>
> *"… we're also building tools to hold advertisers accountable for the content that they share on the platform …"* [7]

### Facebook disabled Plaintiff's account on 2018 Election Day

38.    Having failed to intimidate Plaintiff into silence by exposing him to attackers through The Registry, Facebook then banned his speech completely, by disabling his account.

39.    On election day, November 6, 2018, and for a few days prior, Plaintiff used his Facebook account to advocate for Republican candidates. Prior to that, Facebook had already verified that Plaintiff was an American citizen.

40.    Plaintiff advocated for Republicans, using both non-promoted and promoted Facebook posts, published a few days before and on election day: November 6, 2018.

---

[6] https://newsroom.fb.com/news/2018/06/transparency-for-ads-and-pages/

[7] https://www.facebook.com/business/news/bringing-more-transparency-to-political-ads-in-2019

41.    During election day, Facebook disabled Plaintiff's account, denying the Plaintiff's right to advocate for the Congressional candidates of his choice.

42.    Throughout the election day, Facebook continued delivery of posts from hundreds of millions of Facebook accounts belonging to foreign persons residing abroad, including foreign governments. Facebook allowed them to influence the 2018 US elections in favor of the Democratic party and against the Republican candidates.

43.    After Facebook disabled his account, Plaintiff lost contact with his Facebook followers, and lost access to the posts he had created. Facebook did not give any warning or notice to Plaintiff before or even after disabling his account. Plaintiff was not in violation of any of Facebook policies or terms of service when his account was disabled. Facebook had not alleged to Plaintiff that he or his account were in violation of any Facebook policies or terms of service.

44.    After a few days, Plaintiff contacted Facebook to request that his account be restored. Facebook, in response, prolonged this process for months. After months of waiting, Facebook finally refused to restore Plaintiff's access to his account. Facebook provided Plaintiff with multiple mutually contradictory excuses for disabling his account.

45.    For about twelve months prior the account suspension, Plaintiff heavily invested in his Facebook account, creating scores of posts and attracting about 4,000 followers. Plaintiff and Science for Humans and Freedom Institute had spent more than $50,000 on promotion of their posts.

46.    Even after Facebook disabled Plaintiff's account, it continued making TPMH available in its Registry, for Hezbollah and other entities to find, possibly inciting them against Plaintiff. Thus, Facebook denied Plaintiff support from his

Facebook followers and other Facebook users who may have warned Plaintiff about intended violence by Hezbollah sympathizers or others who may have been incited by Facebook's Registry. Facebook also denied the Plaintiff's public support from his followers and/or other Facebook users, while allowing sundry nefarious actors to gain such support.

47.     On and before the 2018 Election Day, Facebook publicly announced that it protected election integrity from interference by foreign governments and was going to disable and/or had disabled accounts used for interference by foreign governments. On the 2018 Election Day, Facebook had not only disabled Plaintiff's access to his account, but also removed that account completely and deleted all its contents, with the exception of some content still shown in the Registry, which continued to endanger the Plaintiff. Facebook's declaration and subsequent actions created the false impression among Plaintiff's followers and others who saw or interacted with his posts, that Plaintiff's account had been disabled because it has been operated by a foreign government.

48.     Plaintiff is and was a US citizen during the time of the described events. Plaintiff's Facebook account has never been associated with or operated by or under the direction of any foreign government. Plaintiff has not been associated with nor acted under the direction or control of any foreign government since he his arrival in the United States in 1999. Facebook has never claimed otherwise. On the 2018 Election Day and for months prior to it, Plaintiff was in Austin, Texas, and accessed his Facebook account directly from there. The account had a two-factor authentication. This excludes the possibility of a mistake by Facebook.

49.     After Facebook disabled and refused to restore Plaintiff's account, Plaintiff contacted American Express and requested reimbursement for some of the

expenses he and SHFᵢ incurred on Facebook. Those requests partially succeeded, despite scorched earth resistance by Facebook.

50.     During the communications with American Express, Plaintiff learned that Facebook continued making changes to his account, in its internal database, for months after disabling his account. Facebook used printouts, based on forged database records, in communication with American Express.

51.     Facebook has been coordinating with Google and Twitter in its suppression of Plaintiff's speech.

52.     Facebook was coordinating with Google and Twitter in aiding foreign terrorist organizations. Some of it is alleged in the complaint in an unrelated lawsuit, *Jesus Retana and Andrea Moss v. Twitter, Google, Facebook, 3:19-cv-00359-B*, pending before the US DISTRICT COURT for the NORTHERN DISTRICT OF TEXAS.

### The Broad Picture

53.     This complaint arises during a very unusual situation. The Obama administration suppressed most sectors of the economy, restricted citizens' rights to use the internet as they desire, and channeled capital and power towards a few friendly Silicon Valley corporations, including Facebook.

54.     During most of 2017-2018, Robert Swan Mueller III, who had represented Facebook during his tenure in WilmerHale, was investigating the President of the United States and the Attorney General Jeff Sessions[8], and paralyzed the Department of Justice, including its ability to investigate or prosecute Facebook.

---

[8] Robert Mueller, OGE Form 278e https://www.politico.com/f/?id=0000015d-c404-d494-a77f-e6163c3a0001

55.    Facebook has been falsely stating to Congress and to the public that the Russian government had interfered in the 2016 elections, through the Facebook platform, in favor of Donald Trump.

56.    Facebook has failed to disclose foreign governments' interference in the 2016 and 2018 elections, through the Facebook platform, in favor of Hillary Clinton and the Democratic party and against Donald Trump and the Republican party.

57.    Facebook considers itself a supranational entity and doesn't distinguish between the US and other countries. Around 90% of Facebook users reside abroad. Facebook derives most of its revenues from abroad. Even in the US, a large fraction of its revenues come from advertising by companies that are organized under the laws of foreign countries, or in other ways critically dependent on foreign governments. In many foreign countries, international terrorist organizations have tacit or even explicit support of the country's government. Suppressing speech in the US under the direction of those foreign entities seems to be part of the price that Facebook (as well as Google and Twitter) is willing to pay for operating in those countries.

58.    Google, Facebook, Twitter, Microsoft, and a few other companies have been sarcastically called *"Masters of the Universe"*[9], for their habitual disregard of US laws, and for attempting to subject the US to terms and conditions these very companies establish.

59.    Facebook has financially benefited from aiding and abetting terrorist organizations by receiving favorable regulations & freedom to operate in some foreign countries, where those terrorist organizations have political influence in

---

[9] Example: https://www.breitbart.com/tag/masters-of-the-universe/

those governments. This allowed Facebook to make billions of dollars from advertising in those countries and from advertisers located in or dependent on those countries.

60.     Facebook (together with its accomplices Google, Twitter, and Microsoft) undertook an obligation toward the European Commission to police the speech in the US, in accordance with the EU laws, regulations, and whims. In May 2016, they consented to and started to apply the EU *Code of Conduct on illegal online hate speech*[10] worldwide, including in the US. Although much of the language of the Code seems innocuous, they crossed an important line by these actions.

61.     An unusual feature of the EU regulations, to which Facebook and its accomplices have committed, is "working with" (i.e., submitting to demands from) non-governmental organizations. Thus, it is hard to know who truly influences Facebook's decisions to promote, censor, or retaliate against US speakers in each specific case.

62.     Some countries of the European Union consider Hezbollah and/or its local affiliates a legitimate political party and member of the "civil society". By EU rules, this enables Hezbollah to provide input and guidance to Facebook.

63.     On information and belief, Facebook made similar deals with some foreign governments outside of the EU and acted under their direction on American soil.

64.     There is no evidence that Facebook made any such formal agreement with the government of the People's Republic of China. Moreover, Facebook is

---

[10] http://europa.eu/rapid/press-release_IP-16-1937_en.htm

16

prohibited in China. Nevertheless, a large part of Facebook ad revenues come from advertisers dependent on the government of China.

65. On August 22, 2019, Facebook stopped accepting ads from *The Epoch Times*[11], an American publication launched by American citizens associated with Falun Gong - a small religious minority, persecuted in the People's Republic of China.

66. *The Epoch Times* is supportive of Trump and critical of communism and the government of China. Facebook's rejection of The Epoch Times ads "coincided" with escalation of the trade war rhetoric in the US-China trade negotiations and with Hong Kong protests against the government of China.

67. In the US, there has been a constant push from the Left to silence speech it cannot control. Because of the First Amendment and traditional tolerance of diverse political opinions, this suppression takes the following path:

   a. Identify a financial transaction closest to the speech, and ban this transaction; if the transaction cannot be banned,

   b. Demand from the speakers "transparency," including their identities and financial info; then encourage 3rd parties to use this information to retaliate against the speakers.

An example that should be familiar to Facebook is the harassment campaign against defenders of traditional marriage (Proposition 8) in California, 2009-2014.

68. Even if the Registry contained only electoral ads, it would have been a bonanza for foreign governments and other foreign political forces, interested in interfering in US elections. Without such templates, propaganda materials by

---

[11] https://www.theepochtimes.com/epoch-times-statement-in-response-to-nbc-facebook-stories_3053492.html

foreign interlopers might be easily detected by the audience and may have an opposite effect. Such effect was indeed documented in a well-known study[12]. Through the Registry, Facebook also provides targeting information (states, gender, and age of viewers), ad views count and expenses, giving the foreign meddlers a clear picture of what works and what doesn't.

69.     Facebook's inclusion of non-electoral ads in its Registry allows all bad actors, at home and abroad, to take notice and to retaliate against anybody who opposes their agenda. The obvious benefit for the bad actors is the intimidating effects that the inclusion into the Registry creates for a speaker or organization,.

70.     Defendant Facebook's official motto is *Move Fast and Break Things*. The Plaintiff's life is one of those things.

## Causes for Action

## COUNT I. LIABILITY FOR AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)

71.     Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

72.     Defendant has knowingly and intentionally aided and continues to aid Hezbollah and other designated foreign terrorist organizations by supplying them and their supporters and sympathizers with names, addresses, and financial information of the people criticizing them and/or US politicians accused of or perceived as friendly to them.

---

[12] https://www.stratcomcoe.org/download/file/fid/3353

73.     By creating and making this Registry of Political Speech available to foreign terrorist organization and by including in this Registry Plaintiff's post (TPMH) critical of US politicians' tolerance to named foreign terrorist organizations, Defendant stifled speech and action against international terrorism, emboldened terrorists, and aided and abetted acts of international terrorism that have been committed after creation of the Registry.

74.     Defendant has knowingly and intentionally aided and abetted the same terrorist organizations by allowing them and their sympathizers to use of its platform for communication, recruitment, financing, and conducting terrorist acts.

75.     Since Defendant started publishing its Registry with Plaintiff's personal information, these terrorist organizations committed multiple acts of international terrorism against American targets.

76.     These acts of international terrorism led third parties to avoid hiring, contracting with, or otherwise do business with those who are perceived as potential targets of international terrorism, including Plaintiff. Thus, these acts of terrorism, aided by Defendant, have injured Plaintiff in his person and his business as a technology entrepreneur, author, and scientist.

77.     Defendant Facebook is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiff has sustained and is reasonably anticipated to sustain.

78.     Defendant Facebook endangered and continues endangering Plaintiff's life and physical safety. Defendant Facebook has forced Plaintiff to incur expenses to protect his personal security.

**COUNT II. COPYRIGHT INFRINGEMENT PURSUANT TO 17 U.S. Code § 501, FOR VIOLATION OF § 106, 504, and 505.**

79.  Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

80.  Plaintiff has created TPMH and is the copyright owner of TPMH.

81.  Defendant placed TPMH into the Registry without authorization from Plaintiff.

82.  Defendant added content from TPMH to Registry's search index, displayed and continues to display TPMH in the Registry worldwide, and even provides programmatic access to TPMH through an application programming interface (API).

83.  Defendant benefitted from these actions by gaining the goodwill of certain foreign governments, supranational bodies, and other political actors at home and abroad. This goodwill, obtained by violating of rights of Plaintiff and other victims, is translated into billions of dollars, received by Defendant from advertising, which would have been otherwise denied to it.

84.  Defendant published TPMH in its Registry for first time in late May or June of 2018.

85.  Defendant refused to remove TPMH from the Registry. Defendant refused to pay any compensation to Plaintiff.

86.  Defendant is liable for all profits it derived from the publication of the TPMH in the Registry and all other unauthorized use of TPMH.

87.  Plaintiff seeks an award of damages pursuant to 17 U.S.C. §§ 504 and 505; and 15 U.S.C. § 1125(a).

88.  Defendant's infringing conduct has also caused and continues to cause substantial and irreparable injury and damage to Plaintiff, in an amount not

capable of determination, and, unless restrained, will cause further irreparable injury, leaving the Plaintiff with no adequate remedy at law.

89.    Defendant has and continues to willfully and deliberately engage in the acts complained of with oppression, fraud, and malice, and in conscious disregard of the rights of Plaintiff.

**COUNT III. CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS IN VIOLATION OF 42 U.S.C § 1985 (3)**

90.    In the 2018 Congressional elections, Defendant was conspiring with non-defendants Twitter, Google, and other parties, to prevent Trump supporters from giving their advocacy.

91.    Plaintiff is, and was in the 2018 elections period, a US citizen, lawfully entitled to vote and to engage in political advocacy. Defendant and non-defendants Twitter and Google had promised to run electoral ads for everybody so entitled. Plaintiff was interested in running electoral ads advocating for Republican candidates for Congress of the United States in the 2018 elections. Plaintiff managed and controlled advertising accounts with Defendant Facebook as well as non-defendants, Twitter and Google.  A few days before the November 6, 2018 Election Day, Plaintiff submitted electoral ads to run on Twitter and Google. Twitter and Google refused to run those ads either without explanation or with false explanations. Defendant did run the Plaintiff's ads until around midday on Election Day, at which point it disabled Plaintiff's account and stopped running Plaintiff's ads.

92.    Defendant conspired with Twitter and Google to forcibly prevent Plaintiff from giving his advocacy, in a legal manner, in favor of the election of Ted Cruz

and other Republican candidates for the United States Congress. Defendant acted in furtherance of this conspiracy.

93.    Defendant disabled and refused to restore not only Plaintiff's advertising account, but his personal Facebook account, his electoral advertising page, and the page he maintained for Science for Humans and Freedom Institute. Plaintiff had worked for months to build these pages, developing intellectual property, and acquiring followers. Defendant destroyed all of Plaintiff's work in retaliation for his legal advocacy.

94.    By these actions, Defendant has injured Plaintiff in his person and property, and Plaintiff is entitled to recovery of damages.

## REQUEST FOR RELIEF

95. WHEREFORE, Plaintiff requests that the Court:

a. Accept jurisdiction over this action;

b. Orders Defendant to cease and desist publishing its Registry of Political Speech (deceptively named Political Ads Library);

c. Enter judgment against Defendant and in favor of Plaintiff for compensatory damages on all claims in an amount to be determined at trial;

d. Enter judgment against Defendant and in favor of Plaintiff for all costs and treble damages pursuant to 18 U.S.C. § 2333;

e. Enter judgment against Defendant and in favor of Plaintiff for punitive and exemplary damages in amounts to be determined at trial;

f. Order any equitable relief to which Plaintiff might be entitled;

g. Enter an Order declaring that Defendant has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.;

h. Order Defendant to account to Plaintiff for all gains, profits, and advantages derived by Defendant's and third-party users' infringement of Plaintiff's copyright or such damages as are proper, and since Defendant intentionally infringed Plaintiff's copyrights, for the maximum allowable statutory damages for each violation; and

i. Grant such other and further relief as justice requires.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Date: August 28, 2019

Respectfully submitted

Leonid Goldstein

*pro se*

(408) 921-1110

Leo5533@att.net

mail address:

3824 Cedar Springs Rd

#801-1774

Dallas, TX 75219